255014. Mr. Gemmer, am I saying that? That's correct, Your Honor. Thank you. You may proceed. Good morning, Your Honors, and may it please the Court. Jared Gemmer on behalf of Adam Joseph King. Before I jump into my argument, I want to correct one mistake I made in my briefing, which addresses the testimony of Bill Trammell. My briefing said that Bill Trammell's testimony was that some of the health care he was talking about that MV was receiving occurred after her enrollment with the Cherokee Nation. I was reviewing the transcript again this morning. He says it was before her enrollment, but that does not meaningfully change our arguments. I just wanted to correct that for the Court. Thank you, counsel. So, I think the 800-pound gorilla in the room is Hebert, and what's happening with that, because this case is fundamentally, once again, about Indian status. Not just of the defendant, though, but also of the victim. To begin, this case has a few distinctions from Hebert. The first big one is we know that the defendant was not enrolled in a federally recognized tribe at the time of the offense. That was not the case in Hebert. However, it is unbelievably clear from all of the case law, not just in this circuit, but other circuits, that the absence of enrollment is not dispositive. So the government needed to do more than just show an absence of enrollment. Because there are at least three other mechanisms by which a person can be recognized as an Indian. One is the receipt of assistance from the federal government that is reserved exclusively to Indian persons. The second is the enjoyment of benefits of tribal affiliation. And the last is the vague idea of social recognition through perhaps living on a reservation or attending powwows or other tribal ceremonies. We know two other things about Mr. King. His blood quantum, at least one sister is adamant that they have blood relation to Native Americans through their mother's side, not simply through their adoptive father, which would not provide blood quantum at all. The second sister, when asked, the specific question posed to her was whether she was aware of whether anyone in her family beyond the adoptive father had Indian heritage. Her response was, not that I am aware of, no. Judge Matheson, as the author of Hebert, I know Your Honor is quite aware of this, that amounts to, I don't know. Not that I'm aware of is the same as I don't know. Isn't there a big difference, though, between a sister in this case and Ms. Byers in Hebert? The sister is in a much stronger position here to know than Ms. Byers was in Hebert. Wouldn't you agree? I understand that is the case, Your Honor. I agree. Conceptually, she's in a stronger position. Her other sister says we absolutely have Indian status, so she's in just as strong a position. I understand, but I wouldn't be comparing these witnesses in the two cases. That's fair, Your Honor. Is that fair enough? That's fair, Your Honor. When Ms. Guess, it was Kelly Guess who said the I don't know or not that I'm aware of, she was specifically asked about her mother's own Indian heritage, and I believe the responses were I don't know, I don't know. I don't know isn't proof of anything. It's an absence of knowledge. It's not a categorical no, we don't have it. Yes, we do have it. It is I don't know. So blood is an open question, but an open question is not enough for beyond a reasonable doubt for the government's purposes. It needs to prove beyond a reasonable doubt the absence of a blood quantum for that particular element. It has not done so. The other pillar upon which the government rests its case are the text messages between Mr. King and his girlfriend, Emily Inazigasti. The government portrays these text messages, one of them as Mr. King saying that he isn't tribal. The specific statement within that text message was, according to the Cherokee, I wasn't tribal at the time. Now the context behind this is important because Mr. King was held by the Cherokee Nation to simply not be a member of a federally recognized tribe at the time of the offense. That is all the Cherokee said about him. They did not make any other ruling regarding Indian status beyond that fact. There was another text message, I believe, along the lines of the tribal prosecutors knowing they don't have jurisdiction over him. That's a perfectly true statement within the confines of the Cherokee Nation saying he was not enrolled at the time, therefore we can't prosecute him. That is not an admission on his part that he has no Indian blood or no recognition. That is simply a statement of fact. The Cherokee said he wasn't tribal at the time. Those are the only two pillars upon which the government rests its case that Mr. King was a non-Indian at the time of the offense. And I believe that under Hiebert and under Ruiz, that is simply not enough. And the government has failed to prove beyond a reasonable doubt that Mr. King was a non-Indian at the time of the offense. That brings us to MV's status. MV's status is much more complicated. She is also not an enrolled member of a tribe at the time of the offense. She does have a blood quantum. Everyone can agree on that. She is biologically, ancestrally Native American through her mother's side and potentially her biological father's side. The absence of enrollment places her in essentially the same place as Mr. King. There was also no testimony as to social recognition such as tribal ceremonies, powwows, that sort of thing. The distinction is that MV received medical care from Indian hospitals. Now this could have occurred in one of two ways. It could have been provided by the federal government or it could have been provided by tribal hospitals. The four recognition factors, enrollment, federal assistance reserved only for Indians, tribal benefits, social recognition. If the medical care was provided by the federal government, it would only constitute recognition as an Indian if the care provided was reserved exclusively to Indian persons. Now we can think of this in one of two ways. Either the medical care, the benefit, the assistance that the federal government is providing is actually assistance to the parent in the sense that the federal government is assisting the parent in providing medical care to their child. In which case that would be a recognition that Emily N. Azagastee is an Indian. Or, and Emily N. Azagastee naturally is an Indian, she both has blood and enrollment as of the time of the offense, but her recognition is not in question. The second alternative is that MV was an eligible non-Indian person under statutory law. Federal Indian Health Services provides medical care to eligible non-Indians and this is under 25 U.S.C. section 1680C. And this is alluded to in the briefing but not necessarily expanded upon. Eligible non-Indians are defined as the natural born children of eligible Indians and also the stepchildren, adopted children, foster children, legal wards, and orphans of eligible Indians. Under that same statute, an eligible Indian is specifically an Indian who is eligible for health care services for reasons other than those provided in 1680C. And the same statutory scheme defines an Indian as someone who is a member of a federally recognized tribe. So, unless a person is a member of a federally recognized tribe, their receipt of health care services from a federal IHS facility would be through their status as an eligible non-Indian person. That would seem to be what MV was in this case, if she received such health care. That matters because MV, even though she is biologically the child of Emily and Asghasti, her biological relation does not change her legal status in the eyes of IHS. In the eyes of IHS, under the statutory scheme, she is no different than a child from China who was adopted by two Indian parents who then brought that child to an IHS facility. No one in their right mind would say that IHS was recognizing the Chinese child as an Indian. The alternative scenario involves the Cherokee Nation health services, because there is also testimony that could be interpreted as the Cherokee Nation providing health services to MV at times. The factor that is at play there is whether the individual is enjoying the benefits of tribal affiliation. Now, the test doesn't explicitly say whose tribal affiliation, but it goes, I think it is natural to believe that the individual's tribal affiliation is what is being examined. It can't constitute recognition as an Indian if it is not recognizing their own affiliation with the tribe. The problem is all of the testimony in this case, beyond any doubt, shows that MV received all of her medical care because her mother was a member of the Cherokee Nation. Not on her own status, but because of her mother's status. It was incidental benefit based on her mother's tribal affiliation. To say that MV is being recognized as an Indian simply because she is receiving medical care through her mother's tribal affiliation and not her own tribal affiliation reduces Indian status to a genealogical, i.e., a racial status. Because all it cares about is who the child has descended from, not whether the tribe and the child have affiliated together. And I see I have three minutes left. I would like to reserve my remaining time for rebuttal. Question? Thank you, counsel. Mr. Johnson? You're back too, sorry. You're unexcused as well. May it please the court, Elliot Anderson for the United States. Thank you. I will agree with the appellant here that Hebert is tremendously instructive here. I disagree that it calls for reversal because this case could not be more different than Hebert. Why don't we start with Mr. King, the non-Indian status issue. How was your evidence stronger than the evidence in Hebert and Ruiz? In Hebert, the defendant was, in the words of this court, quote, an itinerant with no close personal ties to anyone who could testify about his background and upbringing. In contrast, here, we had Mr. King's two full-blooded sisters who were raised with him. We had Mr. King's intimate partner of seven years, the minor victim's mother. We had a tribal official from the Delaware tribe who testified to Mr. King's misrepresentations in his own enrollment process. And then we had judicial admissions and other admissions from Mr. King himself. Well, what about the two sisters? According to the appellant, we have one of them giving evidence that he was non-Indian, or that he was Indian. If I were to describe that testimony, I wouldn't say that she was adamant. I would say that she was highly equivocal. She said that she believed, had heard, that a great aunt and a great uncle were tribal. But she could not answer a single follow-up question. She couldn't identify what tribe. She hadn't spoken to the aunt or the uncle in some years because the uncle was in prison. She did not remember the aunt's first name. She said, I've never talked to them about their tribal status. So what she had was unfounded speculation that this court and ordiner said that's not enough to negate Indian status, or to show that someone's tribal, just to say, well, I heard a rumor that there's Indian blood in my family. So she was not adamant. She made a baseless assertion that she couldn't back up, and the jury was entitled to find that not credible. But at the end of the day, both sisters admitted, it wasn't just, well, I don't know, I've never really thought about it. They said, there's one person we can name who's tribal. It's our adopted dad. We cannot give you any documentation or proof that anyone else in our family has tribal blood. It wasn't just that they didn't know. It's that there were no records of it. This is more than just, as you said, the witness in Hebert, the stepdaughter who had lived with the defendant for two days. And so the fact that she didn't know his background, not very dispositive, not very persuasive. Here, the sisters, one of whom said, we were not raised with any tribal participation. We didn't go to tribal powwows. We weren't raised in an Indian belief. These are people who would know. So is it your position that both sisters supported the determination? Yes. Both sisters could not identify anyone that they are blood relation to that has Indian heritage. Both sisters, and one said, I don't have no documentation. I have no proof. The first sister said, there is no one else. The second sister had heard a rumor, but then couldn't back it up and said, and we weren't raised with any indicia of tribal recognition. So at the end of the day, in this case, we've got Adam King, a man with no identifiable blood quantum, no blood relatives who are tribal, no legitimate tribal affiliation, just the conjured up one. And then his own admissions in court, when he filed that motion to dismiss in state court and said, two things happened here. In state court, he said, you can't prosecute me, I'm tribal. And in tribal court, he said, you can't prosecute me, I wasn't tribal. And then the explanation for that that was offered by Ms. Anna Zagasti and by defense counsel was, he just didn't understand that the relevant inquiry was, well, were you tribal at the time of the offense? If that was the case, if he finally understood that, he did not at that point come forward and say, oh, well, I have other reasons to support my motion to dismiss. And that was presented to the jury. That was presented to the jury. But this is a man who did not assert any tribal affiliation prior to 2023. So there is ample evidence here. And I cited the Walker case in my brief. And Walker isn't about sufficiency, but admissibility. Like, what kind of a person can testify about the lack of or the presence of Indian heritage? Close family members, like the two sisters here, like the intimate partner that Mr. King had lived with for the past seven years, are exactly the kind of people who can prove this negative. So Mr. King, even when he had the chance in state court, he moved to dismiss and said, you can't prosecute me, I'm tribal. And then never came back and said, and here's how I will prove that I was tribal in 2021. He never came forward with anything on that. His status is proved. The evidence that the jury heard was more than enough for a reasonable jury to say, look, if this person had Indian blood or Indian affiliation, some of these people would have known about it. His full-blood sisters would have known, right? His girlfriend of the past seven years would have known. Nobody had seen anything. And that's more than just, I never thought about it before. That's people who would have seen or would have known and said, we can't prove it. We can't prove any Indian heritage. The minor victim's Indian status, likewise, I think, is much clearer than the appellant brings it out to be. And first I'll say that Drury is, I think, dispositive of this question. In Drury, the court was looking at minor children who were not enrolled until after some of the abuse had happened in that case. And when the court looked at the indicia of tribal recognition in their lives, the very first thing the court identified was, they received tribal health care before they were enrolled. And this court said, and admittedly, sometimes a non-Indian child can get tribal health care, but that's not how these kids got tribal health care. They got health care because they were presumed to be eligible in their own right. The minor victim in this case was documented to be eligible in her own right. And I do want to clarify something that the point the appellant makes about 25 U.S.C. 1680 C. There is no such thing under that statute as a child getting treatment just because they present with an Indian adult. An Indian adult cannot show up with a kid and say, I'm an Indian. Give my kid health care. The child has to have, under that statute, the child has to have a demonstrable link to the Indian community. So it needs to be a biological child, or an adopted child, or a guardianship situation. What happened here? But the biological link alone is enough? The biological link was enough in Drury, and that is how the minor victim in this case qualified. Because when Emily Anna Zagaski enrolled her child with Cherokee Native Health Services, she had to prove her relation to the child. She did not present adoption papers. She did not present a guardianship order. She presented the birth certificate to show that this is my biological descendant. I am Cherokee. This is my Cherokee child. Just as in Drury. And you would say, I know you're relying on that case, but could you just explain the rationale as to why that's probative of Indian status? Because it is recognition. It is both a benefit that is essentially reserved to Indians, with exceptions. But Drury says, we're not going to consider the exceptions if they weren't in play. We're not concerned about how an adopted baby from China might get health care. We want to know, how did this child get health care, and why? And so here she received a benefit reserved to Indians. She also received, and this is prong three of the Prentiss test, a benefit of tribal affiliation. Right? And the LaBeouf case that we cited in our brief points out that, look, health care to a child is both a benefit reserved to Indians, and a benefit of tribal affiliation, more generally speaking. So it is probative there, because for the first 18 months of her life, the victim was treated at the Indian hospital. And then in 2019, she was enrolled with Cherokee Nation Health Services on the basis of being a blood descendant of a Cherokee mother. So it was not just on her mother's benefit. She herself had the same kind of connection that Drury held is sufficient for recognition. I wanted to ask you how the Cherokee Nation's involvement in the custody proceedings could be relevant to the Indian status issue. The Cherokee Nation's involvement was after the abuse came to light, but it was immediately after the abuse came to light. And that, I think, is informative in helping the jury understand the other evidence before them. Because the DHS witness testified that they learned about the abuse on August 23rd, and days later, on August 27th, the tribe was involved in custody. So the fact that the tribe immediately steps in and asserts jurisdiction over this child informs that earlier provision of health care services to the minor victim before she was enrolled. The tribe recognized this girl. When this case came to light, the tribe stepped in because they had already recognized her through the provision of health care services. And then the guardianship involvement only served to confirm that recognition. Drury also mentioned the post-abuse custody things as relevant. And again, we are looking at, were they recognized before? But here, this shows that she was recognized before. The tribe knew her. They didn't say, well, we don't know how you're related to Emily Anna Zagaski. They knew. I will want to make one more point, that in Drury, the court had more facts to work with. The court said, okay, these kids, they've received Indian health care. They went to an Indian camp. There were a couple other in Disha. But one is sufficient. The question here is, did this tribe at any time recognize this minor victim? And they did when they gave her health care services. The law protects all Indian children, not just the ones that are raised in highly participatory environments that put a priority on being involved with the tribe day to day. And so here, and this is the difficult thing we do when we prove cases involving small kids who haven't been enrolled yet, but what have we got? We have the tribe recognizing her with health care services. That is sufficient. Could I come back to Mr. King for just a minute on status? I didn't ask you about the recognition part of the test. Do you want to address that at all and how it compares with Hebert? We have blood. We have recognition. We have blood. We have recognition. So in Disha of recognition, he was not raised. We'll start at the bottom and work up. But his sister testified that they were not raised as social participants in any tribal life. There was no other indication that he had received a benefit from a tribe that was reserved only for Indians. He had certainly not been enrolled with any tribe. Enrollment is the first one. He was not enrolled with any tribe until he enrolled with the Delaware tribe after the fact, and that turned out to be ill-founded. But prior to 2023, he never attempted to enroll or did. So the government wins here if either prong is missing. If there's no blood, quantum, or there's no recognition, and here the evidence is based on the people who were closest to him, neither one of those was satisfied. I want to, if I may, just touch briefly on the multiplicitous charges in this case. And the government concedes that the charges, the Indian status charges and the non-Indian status charges, were multiplicitous, which is permissible under this court's rule, as long as there's no risk of duplicitous judgments or jury confusion. And here there was no risk of that. The judge instructed the jury quite clearly and said, I'm giving you four charges. Don't pay attention to the number of charges. Pay attention to what they say. One set is if you find Mr. King to be an Indian. The other one is if you find the government prove that he's not an Indian. And the judge said, if you're finding Indian status side things, you can't check yes or no on yes on three or four and vice versa. Why, though, isn't it a problem that given that he was charged in the alternative, given that under that approach he was either Indian or non-Indian, and then he had to go to trial understanding that both of those were possible, and then the government presented his trial evidence to show he was not an Indian, why doesn't that put him in a very difficult position coming into trial? And why wouldn't it run the risk of confusing the jury to think that it had to convict him of one or the other when it's entirely possible that the government could fail its proof on Indian status either way? Absolutely. And the jury, the verdict form that the judge prepared and that the government proposed was designed to allow the jury to do exactly that if they felt the government had not carried either burden. It was entirely possible they'd find not guilty all the way down because the government hadn't resolved the issue clearly. If you look at the prosecutor's closing argument, we charged him in the alternative because Mr. King had muddied the waters. He had asserted in different courts that he was both Indian and not Indian at the relevant time, and we did not know what defense he would put on, and so we charged both. By the time we got to the end of the trial and he had decided not to testify, in closing argument the prosecutor told the jury, he's not Indian, there's no evidence that he's Indian, but, and she said this quite clearly, the government has carried its burden to prove to you that he was non-Indian at the time. So ignore charges 1 and 2, they're not in play anymore. Look at 3 and 4, and not just as a default, well, if he's not Indian, he must be non-Indian, but she said very clearly, we have carried our burden to show you that he is non-Indian. Why not just dismiss the first? We could have, Your Honor. It just didn't come up in the heat of the moment, but effectively the government did. We abandoned those charges. We didn't ask the jury to enter a finding of guilt on those. If there are no further questions, I would ask the court to affirm. Thank you. Yes, Your Honor, thank you. I'll actually touch upon the multiplicity issue first, right off the bat, which I'm glad it was brought up. So there is an interesting problem here. Counsel has said that they could have dismissed the charges. A Rule 29 motion was actually filed at the close of government, the government's evidence, and the district judge denied it and allowed both charges to proceed. As to all four charges. As to all four charges. The district judge allowed all four to proceed, which under the Rule 29 standard means there's enough evidence for a jury to find beyond a reasonable doubt that he is an Indian. Let me just ask you, in the government's case in chief, did they elect which way to go on the evidence? Was it clear at that point they were going for non-Indian? I think one could interpret it as they were trying to ask questions that would go that way, but they were also very intentionally not asking certain questions. Backtracking a little bit prior to trial, during the pretrial conference where this issue was raised, I believe counsel for the government at that time said that a Rule 29 would be appropriate on the, what they said, the Indian status charges, because they were intending to proceed on the non-Indian theory, but these were just a backup in case Mr. King changed theories again, which I want to address very quickly. His state court motion said state can't prosecute me because I'm a member of the Delaware tribe. Then, and we also have to keep in mind it's his attorney filing these, not him personally. His state attorney probably did not do adequate legal or factual research to understand what the standard is, because when he gets a tribal court attorney, the tribal court attorney says, you weren't enrolled at the time of the offense, here's a motion to dismiss. Court says, yeah, he wasn't enrolled at the time of the offense, and then he withdraws his state court motion. That's the context of this gambit that the government has referred to a few times. Mr. King at no point made alternative claims to Indian status that it would seem to be worried about within these motions. Could I just ask you, is it your position that it's improper to charge 1152 and 1153 in the alternative in the first place? Yes, Your Honor, it is. Why is that? Why should that not ever happen? I see I am almost out of time, so I will try to answer quickly. It's probably not a short answer. It's not, Your Honor. My reply brief touches on this idea, which is the government is trying to do with a single indictment what it could not do with consecutive indictments. Double jeopardy technically doesn't apply to a single trial unless you're talking about multiple convictions. Double jeopardy otherwise is concerned with consecutive trials, but multiplicity is born out of the idea of double jeopardy. If a charge is multiplicitous, convictions on that both would violate double jeopardy. So what the government has done is it has filed multiplicitous charges and basically said, well, if we lose on one because he raises a defense that defeats it, we automatically win on the other, which is what it would probably try to do if double jeopardy wouldn't prevent consecutive charges, where it would say, we'll charge him under 1152 first, and if he comes back and says he's an Indian and he's found not guilty, we'll just charge him with 1153 afterwards and we've got him dead to rights. The government is accomplishing that objective in a single trial by charging in the alternative in this manner. Mr. King is unable to raise a defense as to this particular element without convicting himself on the other charge. And that's the reason for the prejudice, Your Honor. Well, I'm sure we could talk about this more at length, but I think maybe we ought to call this. Have you ever encountered that before? I mean, this is the first time I've ever encountered that. Thank you, Your Honor, for asking that. No. This is a very creative charging scheme. I'm not only not aware of this ever happening, I can't even – I'm shocked that it did happen. Well, and I'm troubled by what you've said, that it is really a runaround on the double jeopardy issue. Yes, Your Honor. By saying, well, one jeopardy is you're in one trial, but you couldn't do it in two. You're absolutely right. That's right, Your Honor. And that's the fundamental premise of our prejudice argument. We didn't focus too much on the absolute question, the fundamental question, can you have a duplicitous charge? But to me, that's a big issue. I agree, Your Honor. Thank you, Your Honor. Thank you, counsel. Thank you. That completes our arguments today. The case will be submitted. Counsel are excused. The court will be in recess until, what, 8.30 tomorrow? 9 a.m. tomorrow. Oh, it's 9 a.m. tomorrow. You're right, 9 a.m. tomorrow. Thank you.